THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
TIM WADELTON, Defendant-Appellant.

Third District   No. 79-846

Opinion filed March 28, 1980.

Robert Agostinelli and Verlin R. F. Meinz, both of State Appellate Defender's Office, of Ottawa, for appellant.

John X. Breslin and Kenneth A. Wilhelm, both of State's Attorneys Appellate Service Commission, of Ottawa, for the People.

Mr. JUSTICE STENGEL delivered the opinion of the court:

On November 29, 1978, the defendant, Tim Wadelton, pleaded guilty to burglary and misdemeanor theft. Pursuant to the plea negotiations, he was then sentenced to three years' probation for the burglary conviction and to a concurrent term of imprisonment of 314 days for the theft conviction. This term of imprisonment reflected the intent of the parties to the negotiations in that the 364-day term agreed upon was reduced by 25 days for the time the defendant spent in jail plus an additional day for each day he spent in jail.

On July 3, 1979, the State's Attorney of Whiteside County filed a

petition ·charging the defendant with violating his probation by committing the offense of theft by obtaining or exerting unauthorized control over copper wire belonging to Charles Gaumer on July 2, 1979. At the probation revocation hearing, the State's first witness was Whiteside County deputy sheriff Dennis Schantz who testified that on July 2, 1979, he searched a pickup truck belonging to Tim or Jack Rippy. The truck, which Schantz believed to be a 1962 or 1964 GMC or Chevrolet, was located at the Rock Falls police station at the time of the search. Deputy Schantz found some 100 to 200 small pieces of copper wire on the back of the truck and placed a few strands of it in an envelope (People's exhibit No. 1). The wire was about the thickness of a pencil lead and was made up of many small shreds. No other pieces of metal were in the truck when the deputy searched it at 8:45 p.m. Deputy Schantz was recalled later in the proceeding to testify that he had been mistaken earlier about the year of the truck and that he now believed the truck to be a 1968 or 1969 model.

Alex Gaumer, an 11-year-old fifth-grader, was the next person to testify. Alex lived with his parents, Mr. and Mrs. Charles Gaumer, at Ruffit Park in Sterling. Several weeks before the hearing, there was an incident with a truck in which were riding two girls and a boy in the cab and two boys in the back. Alex first saw the truck parked behind his father's store and reported this fact to his father. Mr. Gaumer went to speak to the people in the truck.

Alex later saw the truck heading toward the highway. The truck carried a pile of copper wire in the back. The pile was about two feet by three feet. The boy had helped his father burn the insulation off copper wire and had packed the wire in a box sitting behind his father's store. This box was about two feet by three feet in dimension. The wire in the box looked like the wire in People's exhibit No. 1. Alex went to check the box after seeing the wire on the truck. Finding the box empty, Alex told his father that their wire had been taken.

On cross-examination, Alex noted that the wire he had burned was in rolls and in long pieces. He confirmed that he had not seen anyone handling the wire in the box behind the store, but thought the wire on the truck was the wire from the box because their box was empty when he checked.

Alex' father, Charles Gaumer, followed Alex to the witness stand. Mr. Gaumer was an electrical contractor and also owned and operated Ruffit Park near Sterling. He knew the defendant on July 2, 1979, having seen him at his mother's trailer in the park over the past two years. On July 2, 1979, Gaumer saw the defendant go by the Gaumer house, riding in the back of a 1972 to 1974 GMC or Chevrolet truck. That same truck had been parked behind the store earlier in the afternoon. At the time, it was

about 10 feet away from a box of copper wire Gaumer had. That box was 14 to 16 inches square and three feet high and was full of wire from which the Gaumer family had burned the insulation. The wire in the box was "12 stranded" wire just as the wire in People's exhibit No. 1. The wire from the box, however, had been in large pieces from a large roll. Gaumer believed he had last seen the wire on July 2 or the day before, although he was not at all sure about that. The box of wire had stood more or less by itself along the road.

On the afternoon of July 2, Alex Gaumer reported that a truck had driven off with the wire. Charles Gaumer first checked the box by the store. Finding it empty, he pursued the truck to which his son had pointed. He gave chase at about 75 miles per hour, but he could not catch the truck since there were always two cars between him and the truck. He chased the truck since he had given no one permission to take the wire.

On cross-examination, Gaumer noted that he had not seen anyone load the copper wire from the box. He also noted that the defendant was not in or near the truck when the witness had checked it while it was parked behind the store near the box of wire. According to Gaumer, "12 stranded" wire was not an uncommon wire. Nor was it unusual to have insulation burned off the wire since that is a fairly common junking practice. Gaumer also indicated that the wire in People's exhibit No. 1 could have been anyone's, since there was "nothing particular" about the pieces of wire to indicate that they were his.

Whiteside County Deputy Sheriff Eric Anderson was the State's final witness. On July 2, 1979, Deputy Anderson saw the defendant at about 8 p.m. near Tampico, Illinois. At that time, the defendant was with Don and Jack Rippy, the defendant's sister and a girl named Brenda. Deputy Anderson advised the defendant of a complaint against him and took him into custody.

At the conclusion of this testimony, People's exhibit No. 1 was admitted into evidence over the defendant's objection that the State had not connected the wire to the incident in question. The defendant also moved for a finding of not guilty, arguing that the State had not proved the defendant had taken the wire belonging to Gaumer. The motion was denied.

The defendant then assumed the stand on his own behalf, and testified that at approximately 5:30 p.m. on July 2, 1979, he went to his mother's trailer in Ruffit Park to get clean clothes. He went there with Tim and Jack Rippy, his sister and a baby. The defendant and the Rippy boys had been junking metal all day, collecting scrap metal from various people and hauling it to a scrap dealer. They decided to stop at the defendant's mother's house before going to the junk dealer on a final trip. After leaving Ruffit Park, they collected an engine block from a Mr. Hix

and then went to the junk dealer before he closed at 6 p.m. The defendant did not see a box of copper wire while at Ruffit Park, did not load any wire there and had not discussed loading any wire with the Rippy boys. There had been wire in the truck all day and there could have been wire in the truck when he got back on it at Ruffit Park. The defendant did not notice a large pile of wire, but admitted there was a lot of junk in the truck. Nor did the defendant notice that Mr. Gaumer was chasing them.

On cross-examination, defendant noted that he had scrapped metal with the Rippy boys for only several days. He also reaffirmed that there was a great deal of scrap in the truck when they left Ruffit Park.

Following the presentation of this evidence, the trial court found the defendant in violation of his probation. After considering factors in aggravation and mitigation, the trial court sentenced the defendant to a term of imprisonment of three years, ordering that the time served by the defendant in jail since the filing of the probation revocation petition should be credited against the sentence imposed, but that the time the defendant served in jail during probation would not be so credited.

The first issue raised by the defendant is whether sufficient evidence was presented to sustain the finding of a probation violation as a result of the commission of the offense of theft. A violation of probation need be proved only by a preponderance of the evidence (Ill. Rev. Stat., 1978 Supp., ch. 38, par. 1005—6—4(c)), and the trial court's determination in this regard will be reversed on review only if it is against the manifest weight of the evidence (*People v. Crowell* (1973), 53 Ill. 2d 447, 292 N.E.2d 721).

■■ The circumstantial evidence presented here clearly supports the finding of the trial court. A boy observed five people, three males and two females, parked behind his father's store. Later he observed this truck drive away with a bundle of wire similar to that known to have been in a box behind the store. Upon examination, the box proved to be empty.

Although the boy's father had not observed the defendant at or near the truck when the store owner had confronted this group of people at the rear of the store, the store owner, Mr. Gaumer, had observed the defendant riding in that truck earlier that day.

The defendant admitted spending all day with the "Rippy boys" junking metal and that they stopped at the trailer park before proceeding to the junk yard just prior to the junk dealer's closing time of 6 p.m. At 8 p.m., when the defendant was arrested, he was in the company of two of the Rippy boys and two females. In addition, there were fragments of wire in the bed of the pickup truck which were similar in gauge to the wire Gaumer had behind his store.

■■ These facts certainly support the trial court's determination. Although the defendant denied taking the wire, seeing it behind Gaumer's

store, or even seeing it in the back of the truck, the trial judge is not obliged to accept the defendant's explanation. Furthermore, any explanation by the defendant can be judged by its improbabilities.

Gaumer testified he chased the pickup truck at speeds up to 75 m.p.h., but failed to catch it. The defendant testified he did not know Gaumer was chasing the truck. This is highly improbable.

The defendant argues that the State failed to establish that the wire found in the truck (People's exhibit No. 1) was the wire taken from the rear of the store. People's exhibit No. 1, nevertheless, somewhat corroborates the testimony of the boy that he observed the truck drive away from the rear of the store with a pile of wire very similar in size to the pile of wire kept in the box at the rear of the store. The wire of People's exhibit No. 1 was also "12 stranded" wire, and although this wire is common, it establishes that wire of this type had been carried in the truck.

■■ In the remaining issue, the defendant argues that he should have received credit for the time spent in jail for the theft conviction since the defendant's probationary period for the burglary ran concurrently, and therefore, for some period of his probation he was in custody. When credit is sought for time served in confinement, the appropriate statutory provision to be consulted is section 5—8—7(b) of the Unified Code of Corrections (Ill. Rev. Stat., 1978 Supp., ch. 38, par. 1005—8—7(b)). (*People v. Scheib* (1979), 76 Ill. 2d 244, 390 N.E.2d 872.) That paragraph states:

"(b) The offender shall be given credit on the determinate sentence or maximum term and the minimum period of imprisonment for time spent in custody *as a result of the offense for which the sentence was imposed* * * *." (Emphasis added.)

The defendant here claims no error in the denial of credit as to that period of the probation for which he was not confined. And the statute is very clear that unless the period of imprisonment resulted from the offense for which the sentence was imposed, no credit need be given. In the case at bar, unlike the factual situation in *People v. Scheib* the imprisonment resulted from the theft conviction, not the burglary conviction, and the defendant was entitled to no credit for the time served in custody as a result of the theft conviction.

Accordingly, the judgment of the Circuit Court of Whiteside County is affirmed.

Affirmed.

BARRY and SCOTT, JJ., concur.